# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.: 2020AP1869

†Petition for Review filed

Complete Title of Case:

**METEOR TIMBER, LLC,**

   **PETITIONER-APPELLANT, †**

  **V.**

**WISCONSIN DIVISION OF HEARINGS AND APPEALS AND WISCONSIN DEPARTMENT OF NATURAL RESOURCES,**

   **RESPONDENTS-RESPONDENTS,**

**HO-CHUNK NATION AND CLEAN WISCONSIN,**

   **INTERESTED PARTIES-PLAINTIFFS-RESPONDENTS.**

| | |
|---|---|
| Opinion Filed: | December 16, 2021 |
| Submitted on Briefs: | June 17, 2021 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Blanchard, P.J., Kloppenburg, and Fitzpatrick, JJ. |
|   Concurred: | |
|   Dissented: | |

| | |
|---|---|
| Appellant<br>ATTORNEYS: | On behalf of the petitioner-appellant, the cause was submitted on the briefs of *G. Richard White* and *John Robert Behling* of *Weld Riley, S.C.*, Eau Claire. |

Respondent
ATTORNEYS:        On behalf of the respondents-respondents, the cause was submitted on the brief of *Gabe Johnson-Karp*, assistant attorney general, and *Joshua L. Kaul*, attorney general.

Respondent
ATTORNEYS:        On behalf of the interested parties-plaintiffs-respondents, the cause was submitted on the brief of *Rob Lee*, *Rob Lundberg*, and *Andrea Gelatt* of *Midwest Environmental Advocate*s, Madison, and *Evan Feinauer* of *Clean Wisconsin, Inc*., Madison.

2022 WI App 5

COURT OF APPEALS
DECISION
DATED AND FILED

December 16, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1869**

**STATE OF WISCONSIN**

Cir. Ct. No. **2018CV123**

**IN COURT OF APPEALS**

---

METEOR TIMBER, LLC,

    PETITIONER-APPELLANT,

  V.

WISCONSIN DIVISION OF HEARINGS AND APPEALS AND WISCONSIN DEPARTMENT OF NATURAL RESOURCES,

    RESPONDENTS-RESPONDENTS,

HO-CHUNK NATION AND CLEAN WISCONSIN,

    INTERESTED PARTIES-PLAINTIFFS-RESPONDENTS.

---

APPEAL from orders of the circuit court for Monroe County: TODD L. ZIEGLER, Judge. *Affirmed.*

Before Blanchard, P.J., Kloppenburg, and Fitzpatrick, JJ.

¶1 KLOPPENBURG, J. The Department of Natural Resources (Department) issued to Meteor Timber, LLC, a permit (the permit or the initial permit) and, some months later, an amended permit (the amended permit) allowing Meteor Timber to fill wetlands for purposes of constructing a facility for drying and storing industrial sand and an associated facility for loading the sand onto rail cars and shipping the sand by rail. After a contested case hearing, the Administrative Law Judge (ALJ) issued a decision and order reversing the decisions to issue the permit and amended permit based on his conclusions that the permit and amended permit decisions did not comply with the statutes governing wetland-fill permits. The Department adopted the ALJ's decision without change as its own final decision.[1] The circuit court, in a detailed and comprehensive oral ruling, affirmed. On appeal, Meteor Timber argues first that the ALJ's decision is unsupported by the record and legally erroneous. Second, Meteor Timber argues that the circuit court erred in denying its motion to present additional evidence pertaining to a different wetland restoration project.

¶2 Resolution of the first issue turns not on the merits of Meteor Timber's proposed project as a whole but, instead, turns on whether the Department complied with statutory requirements when it issued the permit and amended permit for the proposed project. We conclude that the ALJ's determination that the Department did not comply with the requirements is based on findings of fact that are supported by the record and on a correct reading of the applicable statutes.

---

[1] For ease of reading, we will generally refer to the Department's final decision as the ALJ's decision, as distinct from the Department's decisions to issue the permit and amended permit, which were reversed.

¶3      Specifically, the ALJ properly determined that the Department failed in the following three, related respects to follow statutory requirements when it issued the permit.

¶4      (1) *Insufficient Information to Consider Environmental Impact.* WISCONSIN STAT. § 281.36(3n)(b)5. (2019-20) requires that the Department consider the net positive or negative environmental impact of the proposed project before deciding to issue a wetland-fill permit.[2] This consideration is necessary for the Department to meet the mandate in § 281.36(3n)(c)3. that it may issue a wetland-fill permit only if it determines that the proposed project will not result in significant adverse environmental impacts. However, the permit states that the Department lacked sufficient information to enable it to assess the proposed project's net positive or negative environmental impact. In addition, correspondence from the Department and undisputed testimony by the Department wetland mitigation coordinator and the Meteor Timber hydrology consultant confirmed that the proposed project lacked sufficient hydrologic and hydraulic information to enable the Department to make a meaningful assessment of net environmental impact at the time that the permit was issued. Accordingly the Department improperly issued the permit without being able to consider the proposed project's net positive or negative environmental impact, contrary to § 281.36(3n)(b)5.

¶5      (2) *Impact to Wetland Functional Values.* Because the Department lacked sufficient information to assess the proposed project's net positive or negative environmental impact, it follows that the Department was specifically

---

[2] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

unable to determine that the project will not result in significant adverse environmental impacts, including, specifically, significant adverse impact to wetland functional values, as required under WIS. STAT. § 281.36(3n)(c)3. Moreover, the permit states that the proposed project will result in the direct permanent loss of 16.25 acres of wetlands, including the irreversible and highly significant loss of 13.37 acres of rare wetlands of "exceptional" value, and that the proposed project will likely not fully compensate for irreversible and highly significant secondary impacts to wetlands. That permit language, along with expert testimony of the wetland ecologist who worked on the permit application credited by the ALJ, that the proposed mitigation plan will not compensate for the loss of the wetlands, establish that the Department could not determine that the proposed project will not result in significant adverse impact to wetland functional values. Accordingly the Department improperly issued the permit contrary to § 281.36(3n)(c)3.

¶6      (3) *Inadequate Mitigation Plan.* WISCONSIN STAT. § 281.36(3n)(d) provides that the Department must require mitigation via a mitigation plan, under § 281.36(3t) and WIS. ADMIN. CODE § NR 350.03(3) and .08-.09, that will offset the loss of the filled wetlands and that includes standards for comparing restored or created wetlands to the filled wetlands and for measuring success.[3] However, the permit's mitigation plan lacked necessary hydrology standards and, according to expert testimony of the wetland ecologist who worked on the permit application credited by the ALJ, will not compensate for the loss of the filled wetlands because it lacked necessary soils and hydrology data as well as hydrology performance

---

[3] All references to the Wisconsin Administrative Code are to the November 2021 register.

4

standards. Accordingly, the Department improperly issued the permit with an inadequate mitigation plan contrary to § 281.36(3n)(d).

¶7 As stated, the ALJ's decision reversing the Department's decision to issue the permit based on the Department's failure to comply with these statutory requirements is based on findings of fact that are supported by substantial evidence in the record and on a correct reading of the law. Accordingly, we conclude that the Department's decision to issue the permit was properly reversed. Because Meteor Timber fails to identify any law that authorizes the Department to issue an amended permit absent a valid initial permit, we conclude that the Department's decision to issue the amended permit was also properly reversed.

¶8 As to the second issue on appeal, we conclude that the record establishes that the circuit court properly exercised its discretion in denying Meteor Timber's motion to present additional evidence.

¶9 Accordingly, we affirm the circuit court's rulings.

## BACKGROUND

¶10 In March 2016, Meteor Timber applied to the Department for a "wetland individual permit," *see* WIS. STAT. § 281.36(3m) (titled "Wetland Individual Permits"), to fill wetlands for purposes of constructing a dry plant processing facility and rail transloading facility for shipment of industrial sand in the Town of Grant, Monroe County.

¶11 In May 2017, the Department issued to Meteor Timber a "wetland individual permit" to fill 16.25 acres of wetlands, including 13.37 acres of rare White Pine-Red Maple wetlands of exceptional quality. The permit contained "[c]onditions necessary to allow Department consideration of the applicant's

5

proposals respective to 'net positive or negative environmental impact'" under WIS. STAT. § 281.36(3n)(b)5. Seven of the conditions required the submission to the Department for its approval of additional information relating to various aspects of the project. An additional thirty-eight conditions required Meteor Timber to either modify the proposed wetland compensatory mitigation plan or submit to the Department for its approval additional information related to that plan.

¶12 Meteor Timber submitted to the Department some of the additional information required by the permit conditions along with a revised mitigation plan. In October 2017 the Department issued to Meteor Timber an amended "wetland individual permit." Like the initial permit, the amended permit contained "[c]onditions necessary to allow Department consideration of the applicant's proposals respective to 'net positive or negative environmental impact'" as required by WIS. STAT. § 281.36(3n)(b)5. Seven of the conditions required Meteor Timber to submit to the Department for its approval additional information relating to various aspects of the project. An additional forty conditions required modifications, or the submission to the Department for its approval of additional information, relating to the proposed mitigation plan for the project. Most of the conditions in the amended permit sought the same additional information and modifications as the permit.

¶13 Clean Wisconsin timely petitioned the Department for a contested case hearing challenging the Department's decisions to issue the permit and the amended permit, and the Department granted the petitions. Ho-Chunk Nation intervened as a petitioner. ALJ Eric D. DéFort in the Division of Hearing and Appeals held the contested case hearing from February 26 until March 2, 2018. At the hearing the parties presented testimony by twelve witnesses (who had each also

submitted pre-filed written testimony that was accepted at the hearing) along with over one hundred exhibits, and several members of the public made statements.

¶14    In May 2018, the ALJ issued a decision and order reversing the Department's decisions to issue the permit and the amended permit. The ALJ concluded that the Department improperly issued the permit because: (1) the Department lacked sufficient information to determine the net positive or negative environmental impact as required under WIS. STAT. § 281.36(3n)(b)5.; (2) the Department issued a permit for a proposed project that, based on the information provided, will result in significant adverse impacts to wetlands contrary to § 281.36(3n)(c)3.; and (3) the Department issued a permit for an inadequate mitigation plan contrary to § 281.36(3n)(d). The ALJ also concluded that the Department lacked statutory authority to issue the amended permit.

¶15    Meteor Timber petitioned the Department secretary for review of the ALJ's decision under WIS. ADMIN. CODE § NR 2.20. The secretary issued an order adopting the ALJ's decision, without change, as "the final decision of the [D]epartment" under WIS. ADMIN. CODE § NR 2.155(1).

¶16    Meteor Timber separately petitioned for judicial review of the ALJ's decision and the Department Secretary's order, and the two actions were consolidated. Meteor Timber subsequently filed motions in the circuit court to present additional evidence pertaining to a different wetland restoration project. In two detailed oral rulings, the circuit court denied Meteor Timber's motions and denied Meteor Timber's petitions for judicial review.

¶17    Meteor Timber appeals both rulings.[4]

## DISCUSSION

¶18    Meteor Timber challenges both the circuit court's denial of its petition for review of the ALJ's decision and the circuit court's denial of its motion to present additional evidence. We address each challenge in turn.

## I. PETITION FOR REVIEW OF THE ALJ'S DECISION

¶19    Meteor Timber argues that the circuit court erred in denying its petition for review because the ALJ's decision is unsupported by the record and legally erroneous. We first summarize the applicable standard of review of administrative agency decisions and the statutory and regulatory provisions governing individual wetland-fill permits. We next provide additional background pertinent to the Meteor Timber permits and the ALJ's findings of fact and conclusions of law. We then explain our conclusion that the ALJ's decision is based on factual findings that are supported by the record and is consistent with the law, and address Meteor Timber's arguments to the contrary.

---

[4] In its ruling denying Meteor Timber's motions to present additional evidence, the circuit court addressed both the motion asking the court to receive additional evidence and remand to the ALJ to consider that evidence under WIS. STAT. § 227.56(1), and the motion asking the court to supplement the record under WIS. STAT. § 227.55(1). Meteor Timber appeals only the court's denial of the motion under § 227.56(1). Accordingly, we address only the court's denial of that motion, and we follow Meteor Timber's lead in referring to that motion as the motion to present additional evidence.

In its ruling denying Meteor Timber's petitions for judicial review, the circuit court explained that it dismissed the petition for judicial review of the Department secretary's order because Meteor Timber made no argument as to that order. Meteor Timber also makes no argument as to that order on appeal, and, accordingly, we do not consider that order further.

### A. Standard of Review

¶20    "When an appeal is taken from a circuit court order reviewing an [administrative] agency decision, we review the decision of the agency, not the circuit court." *Hilton ex rel. Pages Homeowners' Ass'n v. Dep't of Nat. Res.*, 2006 WI 84, ¶15, 293 Wis. 2d 1, 717 N.W.2d 166; *see also* *Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, ¶84, 382 Wis. 2d 496, 914 N.W.2d 21. Pursuant to the Department's authority under WIS. STAT. § 227.46(3)(a) (providing that agencies may in contested cases "direct that the [ALJ's] decision be the final decision of the agency"), the Department of Natural Resources has provided by rule that, "[u]nless the department petitions for judicial review as provided in s. 227.46(8), Stats., the [ALJ's] decision shall be the final decision of the department." WIS. ADMIN. CODE § NR 2.155(1). Here, the Department Secretary did not petition for judicial review of the ALJ's decision and expressly adopted that decision, without change, as the Department's final decision. Accordingly, we review the ALJ's decision as the Department's final decision. *See Hilton*, 293 Wis. 2d 1, ¶14 (reviewing ALJ's decision as the Department's final decision when the Department did not appeal the ALJ's decision, pursuant to § 227.46(3) and § NR 2.155(1)); *Sierra Club v. DNR*, 2010 WI App 89, ¶20, 327 Wis. 2d 706, 787 N.W.2d 855 (when the agency adopts the ALJ's decision, courts review that decision as the Department's decision "by operation of WIS. STAT. § 227.46(3)(a) and WIS. ADMIN. CODE § NR 2.155(1) …. [T]he [ALJ's] decision becomes the [Department's] decision.").

¶21    We deferentially review the ALJ's factual findings and uphold them if they are supported by substantial evidence. As our supreme court has explained:

> WISCONSIN STAT. § 227.57(6) requires the court to set aside or remand an agency action if the agency's decision depends on any findings of fact not supported by substantial evidence in the record. Substantial evidence does not mean a

> preponderance of the evidence. Instead, the test is whether, after considering all the evidence of record, reasonable minds could arrive at the same conclusion.

*Hilton*, 293 Wis. 2d 1, ¶16 (internal quotation marks and quoted sources omitted). It is for the ALJ to determine the weight and credibility of the evidence. *Milwaukee Symphony Orchestra, Inc. v. DOR*, 2010 WI 33, ¶31, 324 Wis. 2d 68, 781 N.W.2d 674.

¶22 We review the ALJ's legal conclusions de novo. *Tetra Tech*, 382 Wis. 2d 496, ¶84. Pursuant to WIS. STAT. § 227.57(5), a reviewing court "shall set aside or modify the agency action if it finds that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action, or it shall remand the case to the agency for further action under a correct interpretation of the provision of law."

¶23 Meteor Timber makes a series of arguments that are inconsistent with the standard of review set forth above, all concerning the level of deference to be accorded the various experts who testified at the contested case hearing and the ALJ's decision. We address and reject each of these arguments as follows.

¶24 Meteor Timber argues that the ALJ's decision is entitled to "no deference." However, consistent with the standard of review set forth above, our analysis does not rely on giving the ALJ's decision deference, other than the deference we are bound to give his factual findings under the substantial evidence test.

¶25 Meteor Timber separately argues that the ALJ was obligated to give either of two levels of deference to the expertise and specialized knowledge of those Department witnesses who testified in support of the permit on which they worked.

Meteor Timber argues at one point that the ALJ "was duty bound to provide *significant* deference" to the Department witnesses' testimony because the contested hearing was held before our supreme court "modified controlling law regarding administrative agency deference." *See **Tetra Tech***, 382 Wis. 2d 496, ¶¶10-16, 32, 83-4 (eliminating the three-tiered standard of giving "great weight deference," "due weight deference," or no deference, by courts to agency decisions). Meteor Timber also argues that the ALJ legally erred in not giving *due weight* deference to the Department witnesses' testimony. *See **id.***, ¶¶78, 108 (citing WIS. STAT. § 227.57(10) and (11)) (directing that a court give "'due weight' to the experience, technical competence, and specialized knowledge of an administrative agency as [the court] consider[s] its arguments" and exercises "independent judgment in deciding questions of law"). Meteor Timber cites no legal authority that applies this directive given to courts to ALJs, and we reject it on that basis. *See **Industrial Risk Insurers v. American Eng'g Testing, Inc.***, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82 ("Arguments unsupported by legal authority will not be considered, and we will not abandon our neutrality to develop arguments." (citation omitted)). This argument amounts to no more than a disagreement with how the ALJ weighed and assessed the credibility of the expert testimony. However, that is not for us to disturb. *See* WIS. STAT. § 227.57(6) ("the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact.").

¶26 We make one additional observation regarding Meteor Timber's deference arguments. In essence, Meteor Timber argues that the ALJ is required as a matter of law to defer to current Department staff's expert testimony over the testimony of opposing parties' experts. Not only does Meteor Timber fail to cite any legal authority supporting such a proposition, but it is not reasonable on its face.

11

As an example, if the Department had denied the wetland-fill permit, we doubt that Meteor Timber would argue that at a contested case hearing on that denial the ALJ would be required as a matter of law to defer to Department staff's expert testimony over the testimony of Meteor Timber's experts.[5]

¶27 We now review the provisions of law that pertain to wetland-fill permits.

## B. Applicable Legal Provisions

¶28 "No person may discharge dredged material or fill material into a wetland unless the discharge is authorized by a wetland general permit or individual permit issued by the department." WIS. STAT. § 281.36(3b)(b).

¶29 This appeal concerns a "wetland individual permit." Within thirty days after submission of an application for a wetland individual permit, the Department must "determine that either the application is complete or that additional information is needed." WIS. STAT. § 281.36(3m)(c). If the Department determines that the application is incomplete, it may make only one request for additional information within that thirty-day period. Sec. 281.36(3m)(d). Within ten days of receiving *all* of the requested information, the Department shall notify the applicant as to whether the application is complete. *Id.* Once the Department has determined that an application is complete or, after receiving all requested additional information, that an application is still incomplete, the Department shall proceed to provide "notice of pending application" to the public, provide a period for public comment on the application, hold a public informational hearing if

---

[5] To the extent that Meteor Timber argues that an ALJ could err by saying that he or she could not consider agency expertise, that argument has no bearing on the circumstances here. Accordingly, we do not consider that argument further.

requested, and issue or deny the permit. Sec. 281.36(3m)(g)-(j). If the Department denies the permit, it must explain why the permit is inadequate or incomplete. Sec. 281.36(3m)(i).

¶30    Three particular aspects of the statutory and regulatory contours of the Department's review of an application for a wetland individual permit are pertinent to this appeal.

¶31    One aspect is that the Department shall issue a wetland individual permit only if it determines three things: that "[t]he proposed project will not result in significant adverse impact to wetland functional values, in significant adverse impact to water quality, or in other significant adverse environmental consequences." WIS. STAT. § 281.36(3n)(c)3.[6]

¶32    Another aspect is that, in assessing the impact to wetland functional values as part of its review of a wetland-fill permit application, the Department must consider all of the following factors:

> 1. The *direct impacts* of the proposed project to wetland functional values.
>
> 2. The *cumulative impacts* attributable to the proposed project that may occur to wetland functional values based on past impacts or reasonably anticipated impacts caused by similar projects in the area affected by the project.

---

[6] "Wetland functional values" include: storm and flood water storage; hydrologic functions relating to dry-season streamflow, discharge of groundwater, and groundwater recharge; filtering or storing sediments, nutrients, or toxins; erosion protection; habitat for aquatic organisms and wildlife; recreational, educational, cultural, scientific, and scenic-beauty values and uses. WIS. ADMIN. CODE § NR 103.03(1)(a)-(g).

For ease of reading, we at times follow the lead of the Department in referring to all three of the determinations specified in WIS. STAT. § 281.36(3n)(c)3. as "significant adverse environmental impacts."

3. Potential *secondary impacts* of the proposed project to wetland functional values.

4. The impact on functional values resulting from the *mitigation* that is required under sub. (3r).

5. The *net positive or negative environmental impact* of the proposed project.

WIS. STAT. § 281.36(3n)(b)1.-5. (emphasis added).

¶33     Finally, the application must include mitigation to offset any adverse environmental impacts of the proposed project. WIS. STAT. § 281.36(3n)(d). A mitigation plan must include baseline studies of the wetlands to be filled and of the mitigation sites; plan and design requirements regarding hydrology; standards for comparing restored or created wetlands to the filled wetlands based on the wetlands' size, location, type, quality, and functional values; and performance standards for measuring success of the mitigation. Sec. 281.36(3t)(d), (e), (f), (h); *see also* WIS. ADMIN. CODE § NR 350.08(3), .09(3)(b) (providing that an adequate mitigation plan must include performance standards and pre-project baseline data including soils and hydrology).

### C.  Additional Background

¶34     We first summarize pertinent portions of the permit and amended permit issued to Meteor Timber, and then summarize pertinent portions of the ALJ's decision and order.

### 1.  Permit and Amended Permit

¶35     Pertinent to the Department's statutorily required consideration of the proposed project's net positive or negative environmental impact, the permit issued to Meteor Timber contained forty-five "[c]onditions *necessary to allow Department*

14

*consideration* of the applicant's proposals respective to 'net positive or negative environmental impact'" under WIS. STAT. § 281.36(3n)(b)5. (emphasis added). Many of those conditions required that Meteor Timber submit additional information regarding the mitigation plan and other aspects of the proposed project.

¶36     The additional non-mitigation-related information that Meteor Timber was required to submit included the following:

> To ensure proper assessment of the environmental impact of the change in land use, the total number of acres of land removed from cranberry beds and total number of acres of land that will be industrial use;
>
> To ensure proper assessment of the environmental impact of reduction in use of chemicals, a description of all chemicals and amounts to be eliminated from the elimination of cranberry operations and to be used for mitigation, restoration, and preservation;
>
> To enable success of proposed wildlife habitat protection, scientific data to support efficacy of proposed wildlife passage methods;
>
> Detailed plans for wetland restoration of Old Town Road;
>
> Detailed plan for drawdown of reservoir areas;
>
> Endangered species habitat mitigation and management plan;
>
> Wetland delineation, detailed vegetation survey, invasive species management plan, and conservation easement to document existence and ensure maintenance of claimed existing high quality White Pine-Red Maple wetlands in preservation area.

¶37     The mitigation-related additional information that Meteor Timber was required to submit concerned the "restoration area" comprising the cranberry beds

to be restored to wetlands, including White Pine-Red Maple wetlands, and the "preservation area" comprising existing unfilled wetlands elsewhere on the Meteor Timber site, also including White Pine-Red Maple wetlands. The required information included collection of data to dictate hydrology performance standards for the restoration area and for the preservation area, and baseline soils data in the restoration area to dictate needed changes to soils components of the mitigation plan.

¶38 In October 2017, after Meteor Timber submitted some, but not all, of the additional required information, the Department issued an amended permit that contained forty-seven "[c]onditions necessary to allow Department consideration of the applicant's proposals respective to 'net positive or negative environmental impact'" under WIS. STAT. § 281.36(3n)(b)5. Those conditions required that Meteor Timber submit additional information and make modifications regarding the mitigation plan and other aspects of the proposed project, most of which included the same information and modifications that had been required in the permit.

¶39 As to the functional values of the wetlands to be filled, the permit contained the following findings. White Pine-Red Maple wetlands are rare and imperiled in Wisconsin. The wetlands to be filled are of exceptional quality in terms of "floristic integrity,"[7] human use values, wildlife habitat, and groundwater processes; of high quality in terms of fish and aquatic life habitat and water quality

---

[7] "Floristic integrity" refers to the biologic condition of the wetland plant community, including the distribution of native and non-native species. *See* Thomas W. Bernthal, *Development of a Floristic Quality Assessment Methodology for Wisconsin*, page 1, https://dnr.wi.gov/topic/Wetlands/documents/FQAMethodWithAcknowledgements.pdf; WISCONSIN DEPARTMENT OF NATURAL RESOURCES, https://dnr.wisconsin.gov/topic/wetlands/methods.html (last visited December 9, 2021).

protection; and of medium quality in terms of shoreline protection and flood and storm water support.

¶40 As to direct impacts to wetland functional values, the permit contained the findings that the mitigation plan "may not compensate for the direct loss of 13.37 acres of exceptional quality White Pine-Red Maple Swamp," and that, while the mitigation plan "could compensate for the direct wetland loss" if "the required performance standards [to be included] in the final, Department approved wetland compensatory mitigation plan" are met, the direct wetland loss "is expected to be irreversible and has high significance."

¶41 As to secondary impacts to wetland functional values, the permit identified adverse impacts to hydrology, presence of invasive species, and wildlife habitat. The permit contained the finding that "[s]econdary impacts to wetlands are expected to be permanent and irreversible and the significance of those impacts is high" and that proposed actions to offset secondary impacts to wetland functional values "are not likely to fully compensate for secondary impacts to impacted wetlands."

¶42 As to cumulative impacts to wetland functional values, the permit identified adverse impacts to "spatial/habitat integrity" and increased filling of similarly rare, sensitive, and valuable wetland plant and animal communities. The permit contained the finding that "significant cumulative impacts [to wetland functional values] may occur."

¶43 The amended permit contained the identical findings as to direct impacts, secondary impacts, and cumulative impacts to wetland functional values as the initial permit findings described above.

## *2. ALJ's Decision*

¶44    We present pertinent portions of the ALJ's decision related to each of the conclusions challenged by Meteor Timber.

¶45    *Insufficient Information to Consider Environmental Impact.*  As to the issue of the Department's required consideration of the proposed project's net environmental impact, the ALJ found that the permit itself stated that the Department did not have the information necessary to determine the net positive or negative environmental impact of the proposed project, and he detailed the missing information identified in the permit in his factual findings.  He highlighted, based on the permit, that the mitigation plan lacked a performance standard for hydrology and adequate soils data.  In addition, based on undisputed correspondence between the Department and Meteor Timber, the mitigation plan lacked hydrologic and hydraulic information.  Further, he found that all of this missing information was, according to the permit and correspondence, necessary to provide a meaningful assessment of environmental impact associated with the proposed project.

¶46    The ALJ summarized these findings in his discussion as follows:  "it is abundantly clear that the [Department] did not have the necessary information to assess the net positive or negative environmental impact of the proposed project at the time that [it] issued the permit[]."  Based on these findings, the ALJ concluded that the Department "improperly granted the permit application because [it] did not have sufficient information to determine the net positive or negative environmental impact under WIS. STAT. § 281.36(3n)(b)5."

¶47    *Impact to Wetland Functional Values.*  As to the issue of whether the Department could determine that the proposed project will not result in significant adverse impact to wetland functional values, the ALJ found as follows.  The ALJ

identified the wetland functional values of the wetlands to be filled as stated in the permit and found, as stated in the permit, that the mitigation plan may not compensate for the direct loss of the rare, exceptional quality White Pine-Red Maple wetland. The ALJ also found, as stated in the permit, that the loss of the wetlands will be irreversible and highly significant; that the secondary impacts will be highly significant, permanent, and irreversible and not likely to be fully compensated for; and that the cumulative impacts will occur as described in the permit. The ALJ also credited testimony by Patricia Trochlell, a retired Department wetland ecologist who had worked on the permit and was also a licensed professional soil scientist and hydrologist. Trochlell testified in pertinent part that, without necessary soils and hydrology data, "there is nearly a zero percent likelihood that the mitigation plan would compensate for the loss created by the proposal to fill the existing wetlands."

¶48 The ALJ summarized these findings in his discussion as follows: "the permanent and irreversible destruction of the rare and exceptionally high-quality wetlands," together with a mitigation plan that had "virtually no chance of successfully compensating" for that loss, established that the proposed project "will most certainly result in significant adverse impacts to wetland function values." Based on these findings, the ALJ concluded that the Department improperly issued the permit because "the proposed project will result in significant adverse impacts to wetland functional values, in violation of WIS. STAT. § 281.36(3n)(c)3."[8]

---

[8] Stated in a way that tracks the statutory language in WIS. STAT. § 281.36(3n)(c)3., the ALJ essentially concluded that the Department improperly decided to issue the permit because, based on the information before it, it could not determine that the proposed project will not result in significant adverse impact to wetland functional values. The parties do not argue that the difference in the language of the statute and that used by the ALJ matters.

¶49 *Inadequate Mitigation Plan.* As to the adequacy of the mitigation plan, the ALJ, again relying on language in the permit, found that the mitigation plan lacked a necessary performance standard for hydrology and necessary soils and hydrology data. The ALJ summarized these findings in his discussion as follows: the mitigation plan was missing the performance standards and description of baseline conditions including soils and hydrologic conditions that are required for an "adequate" mitigation plan under WIS. ADMIN. CODE § NR 350.08(3). Based on these findings, the ALJ concluded that the Department "improperly granted the permit because the mitigation plan was inadequate, in violation of WIS. STAT. § 281.36(3n)(d)."

¶50 *Amended Permit.* The ALJ found that the amended permit suffered from the same factual deficiencies as the permit and was, therefore, improperly issued. In addition, the ALJ concluded that the Department lacked statutory authority to issue the amended permit because WIS. STAT. § 281.36(3m)(i) only authorizes the Department to issue or deny a wetland-fill permit.

## D. Analysis

¶51 We now discuss whether the ALJ's decision is supported by substantial evidence in the record and consistent with applicable law. We first address the three conclusions by the ALJ reversing the Department's decision to issue the permit for its failure to follow statutory requirements, along with Meteor Timber's arguments challenging those conclusions. We then address the ALJ's reversal of the Department's decision to issue the amended permit.

20

## 1. *The Permit*

¶52    *Insufficient Information to Consider Environmental Impact.* The ALJ concluded that the Department improperly issued the permit in the absence of sufficient information to enable it to consider the proposed project's net positive or negative environmental impact, contrary to WIS. STAT. § 281.36(3n)(b)5. As is evident from the additional background above, this conclusion is fully supported by the language of the permit itself and by correspondence between the Department and Meteor Timber confirming the hydrologic and hydraulic information that was missing before the Department could assess the impacts associated with certain aspects of the mitigation plan. That is, the information missing from the mitigation plan was necessary to assess the proposed project's impact on wetland functional values, which was necessary for the Department to determine the proposed project's net environmental impact.

¶53    This conclusion is also supported by Meteor Timber's consultant's testimony confirming the contents of the correspondence and by testimony of the Department's wetland mitigation coordinator, Pamela Schense, who worked on the permit. Schense testified that the permit's conditions "documented … where [the Department] was still asking for information" necessary for the mitigation plan to be assessed and accepted. She testified that a site-specific hydrology performance standard was required for this project, and that there was no final hydrology performance standard at the time the permit was issued. In addition, there was not a final vegetation performance standard. She testified that the Department did not at that time have the baseline data necessary to assess the impacts of the mitigation plan, including soils data and sufficient information about hydrology, wetland delineation, and functional value assessment. All of this testimony mirrored the testimony of retired Department wetland ecologist Trochlell. Like Schense,

Trochlell testified that a site-specific hydrology performance standard was appropriate for this project and that the Department lacked hydrology and soil performance standards as well as sufficient hydrology data to assess the mitigation plan and its resulting impacts.

¶54 Taken together, the permit itself, the correspondence between the Department and the Meteor Timber hydrology consultant and his testimony, and the testimony of Schense and Trochlell constituted more than substantial evidence to support the finding that the Department lacked sufficient information to consider the proposed project's net positive or negative environmental impact. That finding leads to the conclusion consistent with the statute that the Department improperly issued the permit, based on the information before it, without being able to properly undertake that consideration. *See* WIS. STAT. § 281.36(3n)(b)5.

¶55 *Impact to Wetland Functional Values.* The ALJ concluded that the Department improperly issued the permit for a project that will result in significant adverse impact to wetland functional values, contrary to WIS. STAT. § 281.36(3n)(c)3. As is evident from our additional background above, this conclusion is fully supported by the language of the permit itself. It is also supported by Trochlell's testimony that: the plan's vegetation standards are not adequate to compensate for the lost wetlands; and without necessary hydrology performance standards and adequate vegetation performance standards and without necessary soils and hydrology data, the likelihood that the mitigation plan will compensate for the loss of the irreplaceable high quality wetlands is "pretty much zero." The permit language and Trochlell's testimony constitute substantial evidence to support the ALJ's finding that the proposed project will not compensate for the loss of the White Pine-Red Maple wetland. That finding leads to the conclusion, consistent with the statute, that the Department improperly decided based on the information before it

22

to issue the permit even though it lacked the information to determine that the proposed project will not result in significant adverse impact to wetland functional values. *See* § 281.36(3n)(c)3.

¶56 *Inadequate Mitigation Plan.* The ALJ concluded that the Department improperly issued the permit for a project with an inadequate mitigation plan, contrary to WIS. STAT. § 281.36(3n)(d). Again, as is evident from our additional background above, this conclusion is fully supported by the language of the permit itself, along with correspondence between the Department and the Meteor Timber hydrology consultant and testimony by both Trochlell ("there is nearly a zero percent likelihood that the mitigation plan would compensate for the loss created by the proposal to fill the existing wetlands") and Schense (an adequate mitigation plan is needed "to offset … functional loss" due to the project). The permit, correspondence, and testimony constitute substantial evidence to support the finding that the mitigation plan was missing "necessary" baseline data including soils and hydrology and hydraulic information as well as hydrology performance standards, in order for the mitigation plan to be accepted as adequate. That finding leads to the conclusion consistent with the statute that the Department improperly decided, based on the information before it, to issue the permit without an adequate mitigation plan. *See* § 281.36(3n)(d).

¶57 In sum, we conclude that, taking into account the evidence in the record, the substantial evidence test is satisfied and the ALJ's three conclusions are consistent with the applicable law.

¶58 We now address Meteor Timber's arguments to the contrary. We first address its arguments specific to each of the three challenged conclusions. We then

address its argument that applies to the ALJ's decision as a whole, which we refer to as the "conclusions of law argument."[9]

¶59     As a preface to our consideration of Meteor Timber's arguments directed specifically at each of the ALJ's three conclusions, we note that, consistent with the often conclusory nature of those arguments, Meteor Timber concludes those arguments by asserting that the Department and Clean Wisconsin and Ho-Chunk Nation "will proffer a wide array of dizzying minutiae" to support their position on appeal. However, after five days of testimony by twelve expert witnesses and admission of over one hundred exhibits, and under the substantial evidence standard of review that governs this appeal, it is the specific facts that matter.

¶60     *Insufficient Information to Consider Environmental Impact Argument.*     Meteor Timber argues that the ALJ's analysis of whether the Department had sufficient information to consider the proposed project's net positive or negative environmental impact is flawed in several respects. We address each asserted flaw in turn.

¶61     First, Meteor Timber argues that the ALJ erroneously relied too heavily on the heading in the permit, "[C]onditions necessary to allow Department consideration of the applicant's proposals respective to 'net positive or negative environmental impact' …." This argument ignores the substantial evidence summarized above, including the extensive listing in the permits of the missing

---

[9] We admonish Meteor Timber's counsel for making repeated unprofessional and disrespectful comments about the ALJ that have no support in the record. Counsel makes unsupported references to various aspects of the ALJ's analysis as "presumptuous and superficial," "ludicrous," and "astounding." Zealous advocacy is furthered by supported challenges to administrative actions or decisions that could have legal merit, not by gratuitous, disrespectful comments from counsel.

information reflected in the ALJ's detailed findings of fact, as well as testimony by the Department's wetland mitigation coordinator Schense and then-wetland ecologist Trochlell, both of whom worked on the permit, that the Department at the time it issued the permit was missing information necessary for it to be able to assess the proposed project's environmental impacts.

¶62 Moreover, the permit states not only in the heading that the submission of the information required by the conditions was necessary for that assessment, but it also repeats in the list of conditions that some of the required missing information was necessary "to ensure" proper assessment of the environmental impact of various aspects of the proposed project. Meteor Timber's assertion that the conditions merely laid out how the activities must be carried out to result in the "desired" positive impact is not supported by references to the record. *See* **State v. McMorris**, 2007 WI App 231, ¶30, 306 Wis. 2d 79, 742 N.W.2d 322 (court of appeals may "choose not to consider … arguments that lack proper citations to the record."). In addition, that assertion does not accurately describe the specific conditions that, according to the testimony we have already referenced, required the submission of information without which the proposed project's net positive or negative environmental impact could not be determined.

¶63 Second, Meteor Timber argues broadly that conditions are permissible in wetland-fill permits. Certainly that may be true as to conditions, for example, that specify what the performance standards are that will result in a certain environmental impact and what an applicant can and cannot do in light of those standards. However, that cannot be true as to conditions that require the submission of information that the Department needed to make a determination as to the proposed project's environmental impact, as required before it may issue a permit. *See* WIS. STAT. § 281.36(3n)(c)3. and (b).

25

¶64    It would eviscerate the statutory process to allow conditions that, in Meteor Timber's words, "address information not otherwise available at the point of permit application," when that information is necessary for the Department to assess whether it may issue the permit for the proposed project under statutory standards. Meteor Timber does not explain how the Department could determine the proposed project's environmental impact based on information that it did not yet have, particularly in light of the permit's language and the testimony of experts Schense and Trochlell that the Department needed the missing information to make that determination.

¶65    There would be no basis for the Department to deny an application as incomplete if it could simply condition every permit on the submission of additional information, regardless of what the newly submitted information might show as to the proposed project's then-unknown environmental impact. To assert, as Meteor Timber does, that the Department had completed its statutorily required assessment without the information required to make the assessment is illogical. Further, Meteor Timber does not explain the significance of its assertion that the conditions "were not requests for information but were, rather, requirements that certain designated information be provided." Substantial evidence established that the conditions in the permit required the submission of information that the Department needed to fulfill its statutory mandate to consider the proposed project's environmental impact before issuing the permit.

¶66    The legislature has set a tight timeline for the Department to process a wetland-fill permit application. *See* WIS. STAT. § 281.36(3m)(c) and (d). And the legislature has mandated that at the end of that timeline the Department must decide to issue or deny the permit, and explain in the case of a denial why the permit does not meet statutory standards or is incomplete. Sec. 281.36(3m)(i). Meteor Timber

points to no statutory language authorizing the Department to issue a permit if it has not received sufficient information within that timeline. In that situation, the legislature has provided that the Department must deny the permit as incomplete, and the applicant may seek administrative and judicial review of that denial or submit a new application with all necessary information. Sec. 281.36(3q)(b), (h) (requests for administrative and judicial review, respectively).

¶67 Meteor Timber's concluding remark on this topic is that the ALJ's finding that the Department lacked sufficient information to consider the proposed project's environmental impact, and his conclusion that the Department thereby violated WIS. STAT. § 281.36(3n)(b), were "premised on the erroneous belief that the Department lacks authority to include conditions in wetland permits." This assertion fails. Meteor Timber cites no part of the ALJ's analysis to support it. In addition, that analysis and the factual findings on which it is based affirmatively refute it, as we have explained in detail above.

¶68 Meteor Timber's third argument against the insufficient information conclusion is undeveloped. It consists of assertions that the conditions requiring the submission of information unrelated to the mitigation plan seek information that did not matter or was impractical to provide. Putting aside the fact that these assertions largely misrepresent the conditions, we reject the assertions because they are conclusory and unsupported.

¶69 Fourth, Meteor Timber attempts to excuse its failure to provide the required information before the permit was issued by noting that it provided the required information before the Department issued the amended permit. It asserts that the amended permit renders moot any violation by the Department in issuing the initial permit without sufficient information to consider the proposed project's

environmental impact. However, the record belies Meteor Timber's premise that it provided all of the missing information required in the permit; the ALJ found to the contrary, and Meteor Timber's consultant confirmed as much in his testimony. Moreover, Meteor Timber does not explain how its post-permit submission of necessary information "fixes" the Department's failure to follow the statutory requirement that it assess the proposed project's environmental impact before issuing the permit in the first place. Finally, Meteor Timber's argument is not supported by any citations to legal authority, and we do not consider it further. *See McMorris*, 306 Wis. 2d 79, ¶30 (court of appeals "may choose not to consider arguments unsupported by references to legal authority, arguments that do not reflect any legal reasoning, and arguments that lack proper citations to the record.").

¶70 *Impact to Wetland Functional Values Argument.* In a footnote, Meteor Timber suggests that the flaws that it asserts regarding the ALJ's analysis of whether the Department improperly decided to issue the permit without having sufficient information to be able to consider the proposed project's environmental impact, all addressed and rejected above, also apply to the ALJ's analysis of whether the Department improperly decided to issue the permit for a project that will result in significant adverse impact to wetland functional values. We reject this apparent attempted "incorporation" argument because the two statutory requirements depend on distinct analyses of different sets of facts. Therefore, we conclude that, other than the broad deference argument that we have rejected above and a similarly broad legal conclusion argument that we reject below, Meteor Timber fails to make a developed argument that the ALJ improperly concluded that the Department issued the permit without a proper basis to find that the proposed project will not adversely impact wetland functional values, contrary to WIS. STAT. § 281.36(3n)(c)3. We could affirm the ALJ's reversal of the Department's decision to issue the permit as

28

contrary to § 281.36(3n)(c)3. on that basis. *See Wisconsin Conf. Bd. of Trs. of the United Methodist Church, Inc. v. Culver*, 2001 WI 55, ¶38, 243 Wis. 2d 394, 627 N.W.2d 469 (stating that we do not address arguments that are conclusory and insufficiently developed). Instead, we affirm this aspect of the ALJ's decision based on our conclusion, explained above, that it is supported by substantial evidence and consistent with the law.

¶71 *Inadequate Mitigation Plan Argument.* Meteor Timber argues that the ALJ erred in crediting Trochlell's testimony over the testimony of current Department staff, and that "independent review of the record leads to the inescapable conclusion that the Meteor Timber mitigation plan satisfied statutory standards." We reject this argument generally because, as stated, we do not second-guess the ALJ's weighing of the evidence and determinations of credibility; rather our role is to review the record to determine whether the conclusion of law is based on findings of fact that are supported by substantial evidence, and is therefore a conclusion that reasonable minds could make. *See Hilton*, 293 Wis. 2d 1, ¶16. We have explained why we have so determined.

¶72 We also reject this argument based on the seven specific points that Meteor Timber makes in its support.

¶73 First, Meteor Timber argues that "the single most qualified person in Wisconsin to address wetland mitigation," Department wetland mitigation coordinator Pamela Schense, endorsed permit issuance and her opinion is controlling. Both Schense and Trochlell were long-time Department employees who had worked on many wetland-related projects. Meteor Timber cites Schense's testimony as to many aspects of the mitigation plan, "well beyond soils and hydrology." However, Meteor Timber fails to cite any testimony that directly

contradicts Trochlell's testimony, summarized above, that, without the missing hydrology performance standard and hydrology and soil data, the mitigation plan will not compensate for the loss of the exceptional wetlands to be filled. Meteor Timber cites Schense's testimony that it submitted soils data, but only after submission of that data was required by the permit, and ignores her testimony that at the time the Department issued the permit it lacked necessary baseline data to approve a scientifically feasible mitigation project. Meteor Timber also cites Schense's general testimony that safeguards were in place in the permit and the plan to try to make the project successful. However, Meteor Timber identifies no specific testimony from any of the Department staff or its own experts as to the missing hydrology and soil data that the ALJ should have found more persuasive than Trochlell's testimony. The ALJ could reasonably credit Trochlell's specific testimony as to the reasons why the mitigation plan based on the information presented will not compensate for the loss of the wetlands to be filled.

¶74     Second, Meteor Timber argues that other Department staff agreed that the mitigation plan was adequate. However, Meteor Timber cites primarily to the staff's pre-filed written testimony and ignores their qualifications of that testimony at the hearing. Again, the ALJ could reasonably credit Trochlell's more specific testimony on the issue of the mitigation plan's adequacy.

¶75     Third, Meteor Timber argues that the project's approval by the United States Army Corps of Engineers is "significan[t]." However, Meteor Timber does not explain its significance or develop any argument that the federal approval establishes that the mitigation plan was adequate under state law.

¶76     Fourth, Meteor Timber argues that the mitigation plan was the result of exhaustive work by recognized professionals in consultation with Department

staff. However, Meteor Timber does not develop any argument that the specific evidence that it cites establishes that the mitigation plan was adequate.

¶77 Fifth, Meteor Timber argues that the ALJ ignored the permit requirements for ongoing mitigation work and monitoring until the performance standards are met. However, Meteor Timber does not explain how those requirements render adequate a mitigation plan that lacked a hydrology performance standard and necessary soil and hydrology data showing that the plan will be likely to compensate for the loss of the wetlands to be filled.

¶78 Sixth, Meteor Timber seems to argue that the mitigation plan's success in terms of wetland restoration does not matter because success will merely put Meteor Timber "over the amount of required mitigation credits" earned for other components of the plan such as unfilled wetlands preservation. However, this argument disregards that compensation for the loss of the wetlands to be filled was required regardless of how many credits Meteor Timber earned for other components of the mitigation plan. Schense made this clear when she testified that the proposed project will not meet the number of compensatory mitigation credits required by law if restoration is not successful.

¶79 Seventh, Meteor Timber argues that Trochlell lacks credibility. This argument disregards our standard of review. Meteor Timber asserts that she was a "disgruntled former Department employee," but cites no evidence of resentment or bias in the record. Meteor Timber also characterizes her testimony criticizing the project as "neck-wrenching." But it acknowledges that she criticized the project while still working at the Department and that her testimony was "similar" to her comments while at the Department. As the Department and Clean Wisconsin and Ho-Chunk Nation note in their response briefs, Meteor Timber had the opportunity

31

to challenge the soundness of Trochlell's analysis, the weight to be given to her testimony, and her credibility through cross-examination and other means of impeachment. Meteor Timber offers no supported reason for the ALJ to discredit her testimony.

¶80     *Conclusions of Law Argument Regarding Decision as a Whole.* Meteor Timber broadly argues that the ALJ's decision cannot be sustained because all of the thirty-two "findings of fact" except for the first seventeen "findings of historical fact" are not factual findings but legal conclusions that are entitled to no deference. The record refutes this argument. Because Meteor Timber returns to this argument in various iterations throughout its appellate briefing, we address each iteration and explain in detail why the argument fails.

¶81     All but four of the fifteen challenged factual findings are based on, and generally repeat or quote, factual statements in the conditions and factual findings of the permit. We refer to these factual findings based on language in the permit as "the permit-based findings." Meteor Timber does not explain how the Department's own permit language—which Meteor Timber elsewhere appears to argue reflected the specialized knowledge and expertise of the Department staff who testified as to their work on the permit and to which we should accord deference—constitutes conclusions of law.

¶82     The four non-permit-based factual findings also do not support Meteor Timber's legal conclusion argument. One of these findings is based exclusively on Trochlell's testimony and addresses the inadequacy of the soil data that Meteor Timber submitted after the permit was issued; it is not relevant to our analysis of the Department's decision to issue the permit.

¶83    Two findings are based on and repeat language in correspondence between the Department and Meteor Timber's hydrology consultant that concern the hydrologic and hydraulic information that both the Department and Meteor Timber agreed was both necessary to enable the Department to assess the mitigation plan's environmental impact and missing at the time the permit was issued. Meteor Timber does not explain how the undisputed language in this correspondence, confirmed by Meteor Timber's consultant's testimony, constitutes conclusions of law.

¶84    The remaining non-permit-based factual finding is based solely on Trochlell's testimony and repeats verbatim finding number thirteen, which Meteor Timber states is a historical fact that it "does not dispute." Meteor Timber appears to backtrack on this concession by later arguing that this finding is a legal conclusion that the mitigation plan does not meet statutory standards. Meteor Timber is incorrect. The finding states that, "without the necessary soils and hydrology data, there is nearly a zero percent likelihood that the mitigation plan would compensate for the loss created by the proposal to fill the existing wetlands." This finding mirrors Trochlell's testimony as discussed above, which was offered as her expert opinion "with a reasonable degree of scientific certainty," based on what information was missing and what both that missing information (soils and hydrology data and a hydrology performance standard) as well as the information that existed (inadequate vegetation performance standards) meant in terms of the likelihood that the mitigation plan would compensate for the loss of the filled wetlands. Meteor Timber does not specify what about this factual finding taken from Trochlell's expert science-based testimony is a legal conclusion. To repeat, the finding states that the mitigation plan will not succeed given the missing information, and it is based on Trochlell's expert opinion that, to a reasonable

scientific certainty, the mitigation plan will not succeed given that missing information. The finding does not state, as Meteor Timber asserts, that the "mitigation plan failed to satisfy statutory standards." That is the legal conclusion that the ALJ reached, based on his factual findings, and we have already explained why the factual findings support that legal conclusion.

¶85 For the sake of completeness, we note that the two permit-based findings that identify, based on the permit language, missing information comprising a hydrology performance standard and soils data for the mitigation plan, also include two additional statements based only on Trochlell's testimony. Those additional statements are that hydrology and suitable soil and soil depth are critical to successful wetlands restoration. Meteor Timber does not develop any argument that these two statements are legal conclusions.

¶86 In its reply brief, Meteor Timber reiterates its legal conclusion argument with respect to the three non-permit-based factual findings described above plus the two permit-based findings that the Department issued the permit without a performance standard for hydrology and necessary soils data. Specifically, Meteor Timber argues that these six factual findings are legal conclusions as to what information was necessary to satisfy the statutory requirement that the Department assess the proposed project's environmental impact before issuing the permit. We have explained why the three non-permit-based factual findings are findings of fact. As for the two additional permit-based findings, they state only that the Department was missing certain information when it issued the permit. Meteor Timber identifies nothing in those findings that states whether the missing information was necessary to satisfy statutory standards.

¶87 It is factual finding number eighteen that quotes language in the permit to the effect that submission of the missing information identified in the other factual findings—hydrology, hydraulic, and soils data and a hydrology performance standard—was "necessary to allow" the Department to assess the proposed project's environmental impact. Summarizing these various factual findings, the ALJ found that the Department did not have the necessary information to assess the net positive or negative environmental impact of the proposed project when it issued the permit. It is based on this factual finding that the ALJ made the legal conclusion that the Department's issuing the permit without being able to assess the proposed project's environmental impact violated the statutory requirement that the Department consider the project's environmental impact before issuing a wetland-fill permit. We have already explained why the factual findings as a whole support that conclusion of law.

### 2. *Amended Permit*

¶88 Meteor Timber argues that the ALJ misinterpreted the law in reversing the Department's decision to issue the amended permit. Specifically, Meteor Timber argues that the ALJ misinterpreted WIS. STAT. § 281.36(3m)(i) to limit the Department's authority only to issuing or denying a permit, not amending a permit. Meteor Timber points to § 281.36(3q)(b)1, which provides that an interested party may seek review of "the issuance, denial, or modification" of any wetland individual permit, and argues that this provision recognizes the Department's authority also to amend a permit.

¶89 Clean Wisconsin and Ho-Chunk Nation acknowledge that the Department has permit amendment authority but respond that, under WIS. STAT. § 281.36(3m)(i), when the statutory timeline has run, the Department must issue a

permit or a denial explaining why the application is inadequate or incomplete. While the Department must issue a permit upon receipt of a complete and adequate application and may later amend that permit, the statute provides no authority for the Department to issue a permit based on an application that is incomplete and then to issue an amended permit after it determines that it has finally received the missing information. The Department and Clean Wisconsin and Ho-Chunk Nation also argue that the amended permit suffers from many, if not most, of the same substantive deficiencies as the initial permit, and the Department improperly decided to issue the amended permit on that basis alone.

¶90    Meteor Timber fails to cite in its briefing any law supporting the proposition that the Department is authorized to issue an amended permit when there is no valid permit to amend. In the absence of any such citation, and in light of our conclusion that the Department's decision to issue the permit was properly reversed, we conclude that the Department's decision to issue the amended permit was also properly reversed.

## II. MOTION TO PRESENT ADDITIONAL EVIDENCE

¶91    Meteor Timber argues that the circuit court erroneously exercised its discretion in denying its motion to present additional evidence pertaining to a different wetland restoration project. We first summarize the applicable law and standard of review, next present additional background, and then explain why we conclude that the court properly exercised its discretion.

¶92    WISCONSIN STAT. § 227.56(1) provides in part:

> If before the date set for trial, application is made to the circuit court for leave to present additional evidence on the issues in the case, and it is shown to the satisfaction of the court that the additional evidence is material and that

there were good reasons for failure to present it in the proceedings before the agency, the court may order that the additional evidence be taken before the agency upon such terms as the court may deem proper.

¶93    Whether to grant a motion to present additional evidence "is a discretionary determination by the [circuit] court." *Shoreline Park Pres., Inc. v. DOA*, 195 Wis. 2d 750, 773, 537 N.W.2d 388 (Ct. App. 1995).  As we stated in that case,

> where the record shows that the court looked to and considered the facts of the case and reasoned its way to a conclusion that is (a) one a reasonable judge could reach and (b) consistent with applicable law, we will affirm the decision even if it is not one with which we ourselves would agree.

*Id.* (quoted source omitted).

¶94    The additional evidence that Meteor Timber sought to present comprised documentation pertaining to the Kreyer Creek Wetland Mitigation Bank in Tomah, Wisconsin.  As indicated by the documentation, the Kreyer Creek Mitigation Bank involves rehabilitating and restoring wooded swamp.  The documentation includes comments by both Trochlell and Schense in 2015 on various aspects of the planning for the Kreyer Creek Mitigation Bank.  The documentation also includes a 2018 monitoring report for the Kreyer Creek Mitigation Bank that is certified by one of Meteor Timber's consultants and expert witnesses at the contested case hearing, Heidi Kennedy, as having been "prepared by me or under my direct supervision."  Meteor Timber asserted that it first became aware of the Kreyer Creek Mitigation Bank when it received this documentation from the Department in response to a public records request after the close of the contested case hearing.

¶95     The circuit court first considered whether Meteor Timber established good reason for its failure to present the evidence at the contested case hearing before the ALJ. The court summarized Meteor Timber's arguments that it had good reason for not producing this evidence and explained why those arguments failed. The court pointed to Kennedy's certification of the 2018 monitoring report that references White Pine-Red Maple Swamp restoration and the fact that her company worked on the Kreyer Creek Mitigation Bank. The court acknowledged her averment in her affidavit that she was not aware that the Kreyer Creek Mitigation Bank involved White Pine-Red Maple Swamp restoration, but found that she nevertheless had that information available to her both from the contents of the report she certified and, as an expert in this case, from her company.

¶96     The circuit court also pointed out that, despite the fact that Meteor Timber had initially proposed to the Department that it use mitigation credits from the Kreyer Creek Mitigation Bank to mitigate the wetland impacts of its project, it never sought discovery specific to the Kreyer Creek Mitigation Bank or asked the Department more generally before, during, or after the hearing if there was any other project that involved work related to White Pine-Red Maple Swamp. Finally, the court pointed to the public websites from which the information about the Kreyer Creek Mitigation Bank would have been available, even though "it may not have been easy." In sum, the court found that information regarding the Kreyer Creek Mitigation Bank existed and was available and discoverable at and before the time of the contested case hearing.

¶97     The circuit court then addressed whether Meteor Timber established that the evidence was material, using the standard also cited by Meteor Timber in its appellate brief, that the evidence is calculated to have a substantial bearing on a vital issue in the case. *Village of Cobb v. PSC*, 12 Wis. 2d 441, 459, 107 N.W.2d

595 (1961). The court addressed Meteor Timber's argument that the evidence it sought to offer went to the credibility of the two witnesses, Trochlell and Schense, who testified that they were not aware of any previous project reviewed by the Department that sought to restore White Pine-Red Maple Swamp. The court noted that the evidence indicated that whether the Kreyer Creek Mitigation Bank includes White Pine-Red Maple Swamp restoration would be disputed by the experts. Regardless, the court found that there is no indication in the ALJ's decision that the cited testimony had any effect on the decision, noting that he did not mention either the testimony or the words "White Pine-Red Maple." The court determined that, while the evidence would have been relevant, Meteor Timber failed to show that it was material.

¶98 Finally, the circuit court stated that, even if Meteor Timber met its burden to show both good reason and materiality, the court would in its discretion deny the motion for the reasons that the court already discussed.

¶99 On appeal, Meteor Timber makes the following arguments. As to good reason, it argues that the circuit court's good reason rationale was inconsistent because the court found both that the report certified by Kennedy refers to White Pine-Red Maple Swamp restoration and also that the experts would dispute whether the Kreyer Creek Mitigation Bank actually involves White Pine-Red Maple Swamp restoration. Meteor Timber also points to Kennedy's averments that she had no reason to know this fact because she did not read the report for substance and had been repeatedly advised by Trochlell that the White Pine-Red Maple Swamp restoration in the Meteor Timber mitigation plan was unprecedented. Meteor Timber argues that the court should have drawn different inferences from this evidence.

¶100 As to materiality, Meteor Timber argues that the fact that the experts would dispute whether the Kreyer Creek Mitigation Bank actually involves White Pine-Red Maple Swamp restoration does not render the evidence immaterial. Meteor Timber argues that what matters is that the evidence would undermine Trochlell's testimony that the Meteor Timber project is unprecedented and her opinion that the Meteor Timber mitigation plan will not succeed in replacing the filled White Pine-Red Maple wetland.

¶101 The Department and Clean Wisconsin and Ho-Chunk argue that there is no good reason for not earlier presenting the evidence because: Meteor Timber had itself raised the Kreyer Creek Mitigation Bank with the Department as a possible source of mitigation credits over a year before the contested case hearing; Meteor Timber's own expert knew about the evidence before the contested case hearing; that expert herself testified at the hearing that Meteor Timber was "proposing the first white pine-red maple mitigation project in the state;" Meteor Timber did not access publicly available websites, pursue discovery, or question its own experts and the other experts about the Kreyer Creek Mitigation Bank; and Meteor Timber's reference in its appellate brief to its experts' "tireless work" on this project does not persuasively explain how the experts could have missed the Kreyer Creek Mitigation Bank evidence if it is as material as Meteor Timber now argues it is.

¶102 The Department and Clean Wisconsin and Ho-Chunk argue that the evidence is not material because: Meteor Timber fails to show why information at another wetland restoration site would have negated any of the ALJ's conclusions based on its factual findings as to the Meteor Timber site; none of those findings state that no White Pine-Red Maple Swamp restoration has previously been attempted; Meteor Timber's assertion that the ALJ's decision was affected by

40

testimony regarding the unprecedented nature of the Meteor Timber restoration is unsupported by citations to the record; and the evidence does not itself show successful restoration of a White Pine-Red Maple Swamp at the Kreyer Creek Mitigation Bank.

¶103 In its reply brief, Meteor Timber does not respond to any of these arguments in support of the circuit court's denial of its motion. Accordingly, we could deem Meteor Timber to have conceded that these arguments are correct. *See United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (appellant's failure to respond in reply brief to an argument made in response brief may be taken as a concession). However, we affirm because the transcript amply shows that the circuit court considered the facts and reached a reasonable conclusion consistent with the law, and Meteor Timber's arguments amount to no more than that the circuit court should have drawn different inferences and differently weighed the facts. Accordingly, we conclude that the court properly exercised its discretion in denying the motion to present additional evidence.

## CONCLUSION

¶104 For all the reasons stated above, we affirm the circuit court's decision affirming the ALJ's decision reversing the Department's decisions to issue to Meteor Timber a wetland-fill permit and an amended permit based on the Department's failure to comply with statutory standards. We also affirm the circuit court's denial of Meteor Timber's motion to present additional evidence.

*By the Court.*—Orders affirmed.